IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PATRICIA INGRAM, in her
capacity as the natural parent of
Rakesh Dorsey, a deceased minor,
and PATRICIA INGRAM, in her
capacity as the Administrator of the
Estate of Rakesh Dorsey,

               Plaintiff,

   v.

MYLAN PHARMACEUTICALS,
INC.; MYLAN LABORATORIES,
INC.; and MYLAN BERTEK
PHARMACEUTICALS INC.,

               Defendants.

           1:08-cv-0574-WSD

## OPINION AND ORDER

This matter is before the Court on Defendants Mylan Pharmaceuticals,

Inc.'s, Mylan Laboratories, Inc.'s, and Mylan Bertek Pharmaceuticals Inc.'s

("Defendants") Motion for Summary Judgment [57].

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Patricia Ingram ("Plaintiff"), individually and as administrator of

her son's estate, brings this action against Defendants, in which she alleges that her

son, Rakesh Dorsey ("Dorsey"), died as a result of ingesting phenytoin sodium capsules ("phenytoin" or "Phenytek"), a generic prescription drug manufactured and sold by Defendants. Defendants' Statement of Material Facts ("Defs' SMF"), ¶ 1. Phenytoin is an anti-seizure medication used in the treatment of epilepsy patients. Id. at ¶ 2; Plaintiff's Response to Defs' SMF ("Pl.'s Resp. SMF"), ¶ 2. It has been available to be prescribed for over eighty years. Id.

On December 28, 1998, Defendants' Abbreviated New Drug Application ("ANDA") to manufacture phenytoin was approved by the Food and Drug Administration ("FDA"). Defs' SMF, ¶ 4. In approving Defendants' ANDA for phenytoin, the FDA concluded phenytoin was bioequivalent to Dilantin, a brand name drug, and that phenytoin was safe and effective for use as recommended in the approved labeling. Id. at ¶ 5; see Pl.'s Resp. SMF, ¶ 5.

Severe cutaneous adverse reactions such as Stevens-Johnson Syndrome ("SJS") and Toxic Epidermal Necrolysis ("TEN") have been associated with phenytoin, and hundreds of other drugs. Defs' SMF, ¶ 6. The labeling that the FDA approved for phenytoin discloses, in two places on the label, the risks of SJS and TEN reactions. Id. at ¶ 7; Defendants' Motion for Summary Judgment ("Defs' MSJ"), Ex. F. The risks are identified in the "Adverse Reactions" and "Precautions" sections. Id. The labeling lists "serious forms" of "dermatological

2

manifestations" that "may be fatal," including "bullous, exfoliative or purpuric dermatitis, lupus erythematosus, Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis." Defs' SMF, ¶ 8; Defs' MSJ, Ex. F. Plaintiff contends that SJS and TEN also should have been listed under the "Warnings" section of phenytoin's labeling and the labeling should have included information about the early warning symptoms of SJS and TEN. Pl.'s Resp. SMF, ¶¶ 7-8. Plaintiff alleges that Dorsey died as a result of these two reactions.

Dorsey's prescribing physician, Dr. Miguel Zialcita, testified that phenytoin is a safe and approved therapy for patients suffering from epilepsy and other seizure disorders. Defs' SMF, ¶ 3. Dr. Zialcita also testified that he was aware of the risks of SJS and TEN prior to prescribing phenytoin to Dorsey. Id. at ¶ 10. Based on his medical training and experience, and scientific literature, he determined that the potential benefits of phenytoin for Dorsey outweighed the risks associated with the drug. Id. at ¶ 11. Dr. Zialcita testified that his review of the phenytoin label reinforced his general knowledge of the risk of adverse skin reactions associated with phenytoin, and that the labeling provided "anything that [he] would need to know . . . [that was] not already within his body of knowledge." Id. at ¶ 12. Dr. Zialcita stated that despite the known risks, he was

comfortable prescribing phenytoin, continues to prescribe it, and still believes it is "a safe and effective drug product." Id. at ¶ 13-4.

Plaintiff does not dispute Dr. Zialcita's testimony, but claims there is evidence to support that there are higher incidence rates of SJS and TEN in phenytoin than in other antiepileptic drugs ("AEDs"), and that African-Americans appear to have an increased risk of developing SJS and TEN. Pl.'s Resp. SMF, ¶¶ 10-4. These risks, Plaintiff claims, were not disclosed. See id. Plaintiff points out that Dr. Zialcita testified that had the phenytoin label warned him that African-American patients were more susceptible to such reactions, he certainly would have considered the risk in determining whether or not to prescribe the medication for Dorsey. Id. Plaintiff also alleges that the placement of the warnings about SJS and TEN other than in the "Warnings" section understated the risk rendering the warning defective. Id. at 7.[1]

The parties dispute whether Dorsey's prescribing physician, Dr. Zialcita, consulted phenytoin's labeling prior to prescribing phenytoin to Dorsey. See Defs' SMF, ¶ 9; Pl.'s Resp. SMF, ¶ 9. Defendants contend that Dr. Zialcita testified that

---

[1] Plaintiff in her Response to Defendants' Motion for Summary Judgment focuses almost exclusively on the placement of the SJS and TEN warnings as understating the risk as compared to other AEDs which place the risk discussions in the "Warnings" section of the label. Plaintiff cites to no evidence that the risk of SJS or TEN is greater in phenytoin than other AEDs.

"he did not recall at any time consulting the warnings provided with phenytoin," while Plaintiff claims that Dr. Zialcita testified that he had "seen it."  Id.

**B.    Procedural History**

On January 21, 2008, Plaintiff filed her products liability Complaint in the State Court of Fulton County.  In it she alleged a number of state law claims, in which she asserts Defendants are liable for damages resulting from Dorsey's death after taking phenytoin prescribed by Dr. Zialcita to treat Dorsey's epilepsy. Plaintiff alleges specifically that Defendants failed to properly warn Dr. Zialcita of the risk of SJS and TEN and that the risk was elevated for African-Americans. Plaintiff also asserts a state law claim for breach of implied warranty for use of phenytoin by patients like Dorsey.[2]  On February 21, 2009, Defendants removed this action to this Court [1].

On May 13, 2009, Defendants filed their Motion for Summary Judgment [57], seeking summary judgment "on all counts because Plaintiff has failed to establish any alleged inadequacy in the warnings provided by Mylan."  Defs' MSJ, 5.  Plaintiff asserts failure to warn claims in Count I (Strict Liability – Failure to Warn), Count II (Strict Product Liability – Defective Design or Manufacture) in

_____

[2] Plaintiff's claims also include defective design or manufacture (Count II), negligence (Count III), fraudulent concealment (Count IV), gross negligence (Count VI), joint and several liability (Count VII), pre-death injury and pain and suffering (Count VIII), and wrongful death (Count IX).

5

which Plaintiff alleges a defective warning as one of several design defects, Count

III (Negligence) in which Plaintiff alleges Defendants negligently failed to warn,

Count IV (Fraudulent Concealment) in which Plaintiff alleges a fraudulent failure

to disclose the effects of SJS and TEN, Count V (Breach of Implied Warranty) in

which Plaintiff appears to allege that Defendants failed to warn of the risks of SJS

and TEN, and Count VI (Gross Negligence) in which Plaintiff alleges Defendants

were grossly negligent in failing to warn.  In short, failure to warn is embedded in

each of the substantive counts, although Counts II, III, IV, V, and VI allege other

conduct Plaintiff asserts supports her causes of action.  As a result, Defendants'

Motion for Summary Judgment is considered by this Court as a partial motion for

summary judgment that addresses only failure to warn allegations.[3]  On June 2,

2009, Plaintiff filed her Response [59], and on June 16, 2009, Defendants filed

their Reply [61].

---

[3] The Court observes that this litigation appears to center on Plaintiff's failure to warn claims.  To the extent Plaintiff is not pursuing design defect, negligence, fraudulent concealment, and gross negligence not based on an alleged failure to warn, the Court should be advised that this litigation is limited to Plaintiff's failure to warn theory.

## II.    DISCUSSION

### A.    The Standard on Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are the function of the jury . . . ." <u>Graham</u>, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." <u>Herzog</u>, 193 F.3d at 1246.  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Scott</u>, 550 U.S. at 380 (quoting <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotations omitted).

**B.**    <u>Analysis</u>[4]

The central issue before the Court arises under the learned intermediary doctrine.  Defendants claim the undisputed evidence is that Dorsey's treating physician, Dr. Zialcita, at the time he prescribed Defendants' phenytoin, was aware of the fatal adverse risk that the medication could produce SJS and TEN in an ingesting patient and prescribed the medication anyway, because he thought it was the proper treatment medically indicated.  Defendants also argue Plaintiff's claims are preempted.  The Court considers these issues in turn.

---

[4] Plaintiff contends that Defendants' Motion for Summary Judgment was not timely filed.  The Court issued an Order on January 20, 2009, stating that "[e]xpert discovery shall be completed on or before February 27, 2009," and "motions for summary judgment shall be filed within 30 days of the amended close of expert discovery" [52].  Expert discovery did not conclude on February 27, 2009, as ordered.  The deposition of Plaintiff's expert witness, Dr. Parisian, began on February 16, 2009, but was not concluded until May 4, 2009.  Defendants filed their Motion for Summary Judgment on May 13, 2009 [57].  While Defendants technically did not file their brief within thirty days of the Court's deadline for close of expert discovery, the Court notes that Defendants originally filed their Motion for Summary Judgment on December 1, 2008, and it was only because of Plaintiff's failure to meet the Court's discovery deadline that discovery was reopened and new deadlines were set.  The Court has discretion to waive its rules regarding filing dates for summary judgment motions, <u>Edwards v. Shalala</u>, 846 F. Supp. 997, 998 n. 2 (N.D. Ga. 1994), and there is a "strong federal policy [which] favors resolution of disputes on the merits as opposed to disposition on technicalities," <u>Snow v. Bellamy Mfg. & Repair</u>, 1995 U.S. Dist. LEXIS 22113, at *6 (N.D. Ga. Sept. 26, 1995).  The Court declines to dismiss Defendants' Motion for Summary Judgment on this technicality.

### 1.    Failure to Warn Claims

Plaintiff claims that Defendants' labeling of phenytoin failed to adequately warn of the risks associated with the drug.  Defendants deny the labeling was not adequate, but argue that, even if it was incomplete, Plaintiff cannot show that the labeling was the proximate cause of Dorsey's death.  The Court begins with Defendants' argument that, on the undisputed facts here, Plaintiffs cannot prove causation.

#### a.    Causation

Defendants argue that Plaintiff cannot establish that phenytoin's allegedly inadequate labeling was the proximate cause of Dorsey's death, and thus summary judgment is appropriate.  The Court agrees.

A manufacturer is liable in tort for injury to a person caused by an unmerchantable product or one not reasonably suited for its intended use if "its condition when sold is the proximate cause of the injury sustained."  O.C.G.A. § 51-1-11.  One type of product defect for which an action may be brought under § 51-1-11 is based on the product's marketing or packaging.  Banks v. ICI Americas, Inc., 264 Ga. 732, 733 (1994).  Included among marketing/packaging claims are those where it is claimed there was a failure to warn of a risk associated

10

with the product.  It has long been held that some products may not be completely

safe, but still "may be useful and desirable" and are deemed not to be defective if

"they are properly prepared, manufactured, packaged, and accompanied with

adequate warnings and instructions."  Center Chem. Co. v. Parzini, 234 Ga. 868,

870 (1975).

A failure to properly warn a product user of risks attendant to the product

and where the unwarned risk is the proximate cause of the injury suffered by a user

can give rise to a cause of action against the manufacturer.  This analysis is altered,

somewhat, in the area of drugs and medications.  That is because, in the case of

drugs, for example, the person who uses a drug is prescribed it by a physician and

it is the physician who is obligated to understand, and thus be warned about, the

risks of the drug so he may consider them in evaluating whether to prescribe it for

a particular patient.  Considering the reality and practicality of the doctor and

patient relationship, the learned intermediary doctrine developed in Georgia.  The

doctrine is founded on the principle that "[t]he manufacturer of a prescription drug

is not normally required to directly warn the patient of dangers in its use."  Presto

v. Sandoz Pharms. Corp., 226 Ga. App. 547, 548 (1997) (emphasis in original);

McCombs v. Synthes, 250 Ga. App. 543, 545 (2001).  A warning to the physician

is sufficient.  Presto, 226 Ga. App. at 548.  The reasoning of the rule is practical:

"[a]s a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers . . . [and he] acts as a 'learned intermediary' between manufacturer and consumer." Hawkins v. Richardson-Merrell, Inc., 147 Ga. App. 481, 483 (1978). Because it is the physician to whom the warning duty is owed, it logically follows that if the physician already knows the risks presented by the drug, a warning is unnecessary for that physician.

Thus it has developed under Georgia law that when a physician has actual knowledge of the information and risks which otherwise would be required in a warning for the labeling of a drug not to be defective, there is no claim for failure to warn. "Where a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, the plaintiff cannot recover, because the learned intermediary doctrine is broken." Ellis v. C.R. Bard, 311 F.3d 1272, 1283 n.8 (11th Cir. 2002) (quoting Wheat v. Sofamor, S.N.C., 46 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 1999)); Stuckey v. Northern Propane Gas Co., 874 F.2d 1563 (11th Cir. 1989); see also In re Norplant Contraceptive Prods. Liab. Litig., 955 F. Supp. 700 (E.D. Tex. 1987) (no causation where physician was

aware of dangers associated with drug and risk information in warnings would not have changed physician's decision to prescribe). Similarly, where a warning is provided, but a physician does not read it, a person receiving the drug cannot assert a failure to warn claim, even if the warning is defective. Baker v. Smith & Nephew Richards, Inc., No. 1:97-cv-1233-RWS, 1999 U.S. Dist. LEXIS 19760, at *21-3 (N.D. Ga. Sept. 30, 1999).

Defendants claim here that Dr. Zialcita knew of the risks of SJS and TEN in prescribing phenytoin for Dorsey. It is undisputed that prior to prescribing phenytoin to Dorsey, Dr. Zialcita was fully aware that phenytoin could cause SJS and TEN and that SJS and TEN posed risks to patients for whom the drug was prescribed, including Dorsey. Dr. Zialcita specifically and consistently testified that he "knew that SJS and TEN were two potentially deadly adverse cutaneous reactions that might be associated with [phenytoin]" and "that was something [he] knew based on [his] own training regardless of whether . . . that information appeared in the warnings section of the insert, the precautions section of the insert or some other place in the insert." Pl.'s Resp. MSJ, Ex. 5 at 99. Dr. Zialcita testified:

> Q:   [Y]ou knew way back from your medical training that there was a possibility of drug reactions associated with phenytoin or any drug?
>
> A:   Yes.

Q:     And you knew that those drug reactions could be serious and severe?

A:     Yes.

Q:     And you knew that those drug reactions could be deadly?

A:     Yes.

Q:     And you knew that SJS and TEN were two potentially deadly adverse reactions that might be associated with [phenytoin]?

A:     Yes.

Q:     And that was something that you knew based on your own training regardless of whether it appeared, whether that information appeared in the warnings section of the insert, the precautions section of the insert or some other place in the insert, right?

A:     Yes.

Q:     And you knew that whether – even if it didn't appear on the insert at all you already knew it?

A:     Yes.

Pl.'s Resp. MSJ, Ex. 5 at 98-9; see also id. at 85 (indicating that he "didn't need the product insert to tell [him] about the risk of SJS and TEN[.]  [He] already knew it[.]").

After reviewing the phenytoin label and warnings at his deposition he stated again the information simply reinforced what he knew already:

Q:     Reviewing the product label . . . reinforces your general body of knowledge that adverse skin reactions associated with this medication might in some instances be severe?

A:     Yes.

Q:     Since the label reinforced your general body of knowledge as it relates to the risk of severe cutaneous reactions associated with medications, sir, is there anything in this label that you feel you needed to know that was not provided to you as a clinician?

A:     I wouldn't know that there is.

Q:     You can't think of anything that you would need to know that's not in the label and not already within your body of knowledge?

A:     Not at the moment, no.

Id. at 79-80.

Aware of the risks of SJS and TEN reactions in administering phenytoin, Dr. Zialcita said this about why he prescribed it for Dorsey: "the benefits [Dorsey] might obtain from phenytoin outweighed any risks that might be associated with that drug." Id. at 85.

The undisputed evidence is that Dr. Zialcita was, before he ever prescribed phenytoin to Dorsey, equipped with the knowledge about the risks associated with SJS and TEN. Based on his knowledge and awareness of this risk – which he knew without having to read any label – Dr. Zialcita made the informed decision to prescribe phenytoin to Dorsey because he believed this was the best treatment

15

regimen for him.  Plaintiff cannot show causation.  See Bodie v. Purdue Pharma

Co., 236 Fed. Appx. 511, 519 (11th Cir. 2007) (quoting Christopher v. Cutter Lab.,

53 F.3d 1184, 1192 (11th Cir. 1995) ("the causal link between a patient's injury

and the alleged failure to warn is broken when the prescribing physician had

'substantially the same' knowledge as an adequate warning from the manufacturer

should have communicated to him")).[5]

        b.     Adequacy of the Label and Whether Dr. Zialcita's
              Knowledge of the Risks Was Complete

Plaintiff next argues that summary judgment should be denied because the

warnings in the phenytoin label are inadequate in two particulars:

1. The labeling's arrangement – specifically, the inclusion of SJS and TEN in
   the "Adverse Reactions" and "Precautions" sections, but not in the
   "Warnings" section – renders the labeling inadequate because it diminishes
   the seriousness of the risk of SJS and TEN and gives the impression that
   phenytoin is less likely to cause SJS and TEN than other AEDs that include
   such information in the "Warnings" section.

2. The labeling should have noted that there is higher incidence rate of SJS and
   TEN associated with phenytoin among African-Americans.

---

[5] Defendants also assert that Dr. Zialcita did not read phenytoin's label, and,
therefore, Plaintiff cannot establish causation.  Plaintiff contends that Dr. Zialcita
testified that he had at least seen the label.  It is unnecessary to address this
argument because the Court has found lack of causation on an alternative ground.
The Court notes that had it addressed this issue it would have concluded Dr.
Zialcita did not read the "Warnings" section or the sections of the label that
addressed SJS and TEN, likely because he knew the risks based on his extensive
experience with the drug.

Pl.'s Resp. MSJ, 6-9.

Subsumed in this second argument is the more nuanced claim that even if Dr. Zialcita knew the general fatal risk of SJS and TEN in the administration of phenytoin, he was not aware of an alleged higher incidence of SJS and TEN reactions in African-Americans. Plaintiff thus seems to argue that the warning was inadequate and this defect is not impacted by the learned intermediary doctrine. The Court again disagrees.

### i.    *Arrangement of the Labeling*

Plaintiff argues the warning label for phenytoin was inadequate because the fact that the risk of SJS and TEN reactions was potentially fatal required it to be disclosed in the "Warnings" section of the label rather than the "Adverse Reactions" and "Precautions" sections. Because other AEDs warn of the risk of SJS and TEN reactions in the "Warnings" section, Defendants' placement of the disclosure in other sections of the label could be interpreted as understating the SJS and TEN risks associated with the use of phenytoin.

Plaintiff does not dispute that the risk of SJS and TEN reactions was accurately described in the "Adverse Reactions" and "Precautions" sections of the label. Plaintiff's argument is based on the positioning of the warning in the label. The argument is discredited by the application of the learned intermediary doctrine

17

here.  The record is convincing, and undisputed, that Dr. Zialcita knew fully the

risk of SJS and TEN reactions and exercised his medical judgment that the benefits

of the drug outweighed the SJS and TEN risks when he prescribed it for Dorsey.

The facts set forth a classic example of the application of the learned intermediary

doctrine and discredit the warning placement argument advanced by Plaintiff.[6]

---

[6] Plaintiff offers the opinions of Suzanne Parisian, M.D. and Evan H. Schlam, M.D. to support her labeling arrangement argument.  Dr. Parisian and Dr. Schlam contend that the risk of SJS and TEN should have been included in the "Warnings" section of the label.  Dr. Parisian opines that the federal regulations (21 C.F.R. § 201.57) require that "serious adverse reactions" be listed in the "Warnings" section, and that phenytoin's label is inadequate because SJS and TEN are not listed in that section.  She further claims the failure to include SJS and TEN in the "Warnings" section, and the decision to include them in the "Adverse Reactions" and "Precautions" sections instead, understates the risk of these reactions.  Dr. Schlam asserts that Defendants' failure to list SJS and TEN in the "Warnings" section and to include it only in the "Adverse Reactions" and "Precautions" sections "gives physicians the mistaken impression that Phenytek is less likely to cause serious skin reactions than other AEDs that include information about SJS, TEN, and other serious skin reactions in the 'Warnings' section of their labels."  Pl.'s Resp. MSJ, 7.  This in turn, he opines, prevents physicians from being "able to properly perform a risk-benefit analysis when deciding whether to prescribe Phenytek to their patients," and may lead physicians to "underestimate of the risk to their patients of developing SJS or TEN."  Id.  Even if this testimony survived a Daubert analysis and is true, the facts here show that Dr. Zialcita knew the risks, weighed them against the benefits, and chose to prescribe the medication. The fact is Dr. Zialcita is intimately familiar with this pharmaceutical, having prescribed it throughout his career for patients with the same condition as Dorsey. See Pl.'s Resp. MSJ, Ex. 5 at 62-5.

ii.    *Alleged Higher Incidence of SJS and TEN Among African-Americans*

Plaintiff asserts there is a higher incidence of adverse SJS and TEN reactions among African-Americans, that this risk was not disclosed anywhere in the warnings, and was unknown to Dr. Zialcita.  Plaintiff argues this failure to warn presents an issue upon which summary judgment cannot be granted.  The only evidence in the record on which Plaintiff relies to support this argument is the opinion testimony of Dr. Parisian.  The Court concludes that Dr. Parisian is not qualified to offer her opinion and the opinion is otherwise unsupported by any relevant or credible information.  Dr. Parisian's opinion and testimony do not meet the requirements of Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).[7]  Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied

---

[7] Neither Plaintiff nor Defendants requested a Daubert hearing and the Court concluded the information in the record, including Dr. Parisian's report, was sufficient to evaluate the admissibility of Dr. Parisian's testimony on this specific, and limited, issue.

the principles and methods reliably to the facts of the
case.

The district court serves a gatekeeper function in determining whether expert

testimony is allowed under Rule 702.  To perform its role as a gatekeeper, the

Court must consider whether (i) an expert is qualified to testify regarding the

matters he intends to address, (ii) the expert's methodology is sufficiently reliable

under Daubert, and (iii) the expert's testimony assists the trier of fact to understand

the evidence or to determine a fact in issue.  Quiet Tech. DC-8, Inc. v. Hurel-

Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003).  Daubert sets forth a

non-exclusive checklist for use in evaluating the reliability of scientific expert

testimony.  The factors include: (1) whether the expert's technique or theory can be

or has been tested – that is, whether the expert's theory can be challenged in some

objective sense, or whether it is instead simply a subjective, conclusory approach

that cannot reasonably be assessed for reliability; (2) whether the technique or

theory has been subject to peer review and publication; (3) the known or potential

rate of error of the technique or theory when applied; (4) the existence and

maintenance of standards and controls; and (5) whether the technique or theory has

been generally accepted in the scientific community.  Daubert, 509 U.S. at 593-94.

Dr. Parisian opines that phenytoin's label should have noted that African-

Americans are more likely to develop SJS and TEN than other population

20

subgroups.  Plaintiff contends that there are "studies, case reports, foreign labels, and literature suggesting that subpopulations of patients, including African Americans, appear to be at increased risks of developing hypersensitivity reactions like SJS/TEN."  Pl.'s Resp. MSJ, 8-9.  Defendants argue that Plaintiff has "fail[ed] to produce any qualified testimony or reliable scientific evidence for such an assertion to be included on the labeling."  Defs' Reply, 9.  The Court agrees.

The only evidence Plaintiff provides in support of her claim that African-Americans may be more likely to develop SJS and TEN than other population subgroups is a single, two-sentence paragraph in Dr. Parisian's report:

> The labeling for Mylan's Phenytek does not include any language, in any section, to warn physicians that there are certain subpopulations of patients, including African Americans, which appear at increased risk for developing hypersensitivity reactions.  There are studies and reports in literature suggesting that subpopulations are at increased risk but Mylan has not conducted its own safety studies to identify the risk not [sic] has it updated its warnings.

Pl.'s Resp. MSJ, Ex. 3 at ¶ 61.

Dr. Parisian's opinion does not mention SJS or TEN, the reactions that Plaintiff contends should have been included in the label.  The opinion, in fact, states that there is an increased risk of "hypersensitivity reactions" generally in African-Americans.  Dr. Parisian does not state that African-Americans are more likely to develop SJS and TEN (or other undefined "hypersensitivity reactions")

21

than other population subgroups, which is what Plaintiff claims should have been included in phenytoin's label. She also does not state there is evidence to suggest an increased risk of SJS or TEN reactions resulting from the use of phenytoin or any other AED for that matter. She only states that it "appear[s]" and there is literature "suggesting" that African-Americans are at an increased risk for developing hypersensitivity reactions generally. She offers no connection of these reactions to drug usage. This opinion, which fails even to try to relate this unspecific hypersensitivity view to the reactions at issue in this case, not only is not competently offered, but, as offered, does not assist the trier of fact in determining whether Defendants should have included the affirmative statement that African-Americans are more likely to develop SJS and TEN from use of phenytoin or any other AED. Dr. Parisian has not provided any "scientific, technical, or other specialized knowledge" that Rule 702 requires for an opinion to be competent and admissible. Dr. Parisian's testimony fails to meet the basic, fundamental requirement of competency. Her general, unsupported opinion based upon what she has read in unidentified and undescribed "studies and reports" simply is not admissible. That Plaintiff would rely on such an "opinion" in federal litigation is troubling. The opinion is sophomoric at best. The Court finds that Dr. Parisian does not meet even the threshold requirements of Rule 702.

Applying the <u>Daubert</u> criteria for evaluating the scientific reliability of expert opinions, the Court concludes the evidence upon which Dr. Parisian relies and her opinion are strikingly unreliable. Dr. Parisian identifies two categories of evidence in support of her claim that African-Americans may be more likely to develop SJS and TEN than other population subgroups:

1. Dilantin labels from Canada, the Netherlands, and the Czech Republic, which "talk about increased risks for African American[s]" regarding hepatoxicity and hypersensitivity reactions. Pl.'s Resp. MSJ, Ex. 10-A at 104-05.

2. A 1998 article entitled "Antiepileptic Drug Hypersensitivity Syndrome," by Schlienger and Shear. Defs' Reply, Ex. A at 33-4, 44-6; <u>see also</u> Pl.'s Resp. MSJ, Ex. 9 at 117-19.

<u>See</u> Defs' Reply, Ex. A at 44-6.[8]

The Court first notes that the Dilantin labels from Canada and the Czech Republic are dated after Dr. Zialcita prescribed phenytoin to Dorsey, <u>id.</u> at Ex. A, 44, and the only information mentioned in the labels is that there is "case report" information of increased incidence of hypersensitivity and hepatoxicity in African-

---

[8] Dr. Parisian also mentions medical literature addressing "variations of cytochromes that would make black – African-Americans at increased risk of slow metabolism of phenytoin," Pl.'s Resp. MSJ, Ex. 10-A at 105-06, 148, and sources suggesting that hypersensitivity reactions to certain drugs, but not phenytoin or another AED, may occur more frequently in those of African descent, <u>id.</u> at Ex. 10-A, 146-47. This information is not material to whether the incidence rate of SJS and TEN is higher in African-Americans than other population subgroups.

American patients. See Pl.'s Resp. MSJ, Ex. 9 at 121-28. "Case reports" have been held to "reflect only reported data, not scientific methodology" and are insufficient to establish that a drug caused a particular reaction. Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1199 (11th Cir. 2002); see also Leathers v. Pfizer, Inc., 233 F.R.D. 687, 694 (N.D. Ga. 2006). The Court finds that the foreign labels are wholly insufficient to support the opinion offered by Dr. Parisian.

The 1998 article cited by Dr. Parisian also does not provide reliable evidence that there is a higher incidence rate of SJS and TEN in African-Americans. The portion of the article to which Dr. Parisian cites states: "Although the majority of reported cases [of hypersensitivity reactions] have been in black patients, this may be related to the higher incidence and prevalence of epilepsy among blacks than among whites." Defs' Reply, Ex. A at 45. Dr. Parisian extrapolates from this broad general statement that African-Americans account for the majority of reported cases of hypersensitivity, to support a contrived opinion that the warning label here was inadequate because it did not forecast an increased risk of SJS and TEN in African-Americans. This cavalier "opinion" is of doubtful intellectual integrity. The article upon which Dr. Parisian "relies" does not refer to SJS or TEN specifically, and the authors have not performed any further research to support an increased risk of SJS or TEN in African-Americans. Indeed, Dr.

Schlam, Plaintiff's other expert witness, acknowledges the flawed basis of this opinion, noting that "epilepsy in general is more common in African-American patients and that is a possible flaw in what they [the authors] are stating." Pl.'s Resp. MSJ, Ex. 9 at 118-19. This article simply does not and cannot support Plaintiff's claim that the labeling is flawed for not disclosing an increased risk of SJS or TEN in African-Americans. Her opinion has not been tested or objectively evaluated, there is no evidence that the basis for it has been peer-reviewed, and there is nothing offered to show the conclusion or how she reached it is generally accepted in the scientific community. See Daubert, 509 U.S. at 593-94. This opinion falls far short of the requirements of Rule 702.

Both Dr. Parisian and Dr. Schlam ultimately admit the obvious – that they are not aware of any reliable evidence to support Plaintiff's contention that African-Americans have a higher incidence rate of SJS and TEN than other population subgroups. Dr. Parisian admits that she is not "aware of any peer-reviewed scientific literature that was published prior to April 2005 which states that African-Americans are at an increased risk of developing Stevens-Johnson Syndrome or toxic epidermal necrolysis as compared to any other population subgroup." Defs' Reply, Ex. A at 46. Dr. Schlam admits that that there is no confirmed scientific evidence that the incidence rate of SJS and TEN is higher

among African-Americans than it is among other groups.  Pl.'s Resp. MSJ, Ex. 9 at

118-21.

Plaintiff has not provided any reliable evidence to support her proposition

that the labeling was inadequate because it did not disclose that African-Americans

are more likely to develop SJS and TEN than other groups.  Indeed, there is not

any evidence of a disproportionate impact.[9]

Because Plaintiff cannot show causation and has not otherwise shown that

phenytoin's labeling was inadequate, summary judgment on Plaintiff's failure to

warn claims and allegations is appropriate.[10]

---

[9] To the extent Plaintiff also alleges that the labeling should have indicated that phenytoin is more likely to cause SJS and TEN than other AEDs, neither of Plaintiff's expert witnesses supports this proposition.  Dr. Parisian states in her report that phenytoin is "as likely or more likely to cause SJS, TEN, and other serious skin reactions than many other Anti-Epileptic Drugs."  Pl.'s Resp. MSJ, Ex. 3 at ¶ 58 (emphasis added).  Dr. Schlam acknowledged that he could not opine that "the risk [of SJS or TEN] for phenytoin has a higher statistical significance than any of the other AEDs."  Id. at Ex. 9, 99.  The Court finds that Plaintiff has not presented any evidence that Defendants' label was unreasonable or inadequate in failing to include a warning that phenytoin is more likely to cause SJS and TEN than other AEDs.

[10] Although Defendants do not outline which claims they allege constitute "failure to warn claims" as the Court noted earlier, the Court finds that its analysis applies to Plaintiff's specific failure to warn claim and any other claims to the extent they depend on Plaintiff showing that Defendants' alleged failure to adequately warn of the risks associated with phenytoin was the proximate cause of Dorsey's death.

### 2.    Breach of Implied Warranty Claim

Defendants next contend that summary judgment should be granted as to Plaintiff's breach of implied warranty claim because Dr. Zialcita was aware of the risks of SJS and TEN and did not rely on the label in making his prescribing decision.  Plaintiff claims that her breach of implied warranty claim is viable because Defendants failed to warn Dr. Zialcita adequately of the risks associated with phenytoin, and Dorsey relied on Dr. Zialcita's prescribing advice.

The learned intermediary doctrine also bars Plaintiff's recovery for breach of implied warranty.  In <u>Presto v. Sandoz Pharmaceuticals Corp.</u>, 226, Ga. App. 547 (1997), the Georgia Court of Appeals found that because the plaintiffs in that case were "legally deemed to have relied on [the prescribing physician's] advice, and not on the package labeling, they cannot show any breach of warranty caused by inadequate package labeling proximately caused the injury claimed."  <u>Id.</u> at 551. Here, not only did Dorsey rely on Dr. Zialcita's prescribing advice, but Dr. Zialcita's advice was based on his independent knowledge of the risks of SJS and TEN regardless of what was contained in phenytoin's label.  Summary judgment on Plaintiff's breach of implied warranty claim is appropriate.[11]

---

[11] The Court notes also that Plaintiff has not shown that there was privity between Dorsey and Defendants.  "Under Georgia law, a plaintiff may only raise a claim for breach of warranty where he is in privity with the seller of the allegedly

### 3.    Preemption of Failure to Warn Claims

Defendants argue that Plaintiff's failure to warn claims are preempted by federal law.  Defendants contend that if state law required them to change phenytoin's labeling, it would conflict with federal law, which prohibits a generic drug's labeling from deviating from that of its brand name counterpart.  Plaintiff argues that manufacturers of generic drugs, like Defendants, are permitted to alter their labels to include additional warnings after initial approval by the FDA.  The Court evaluated and decided the failure to warn claims in this litigation because it concludes preemption does not apply.

Defendants allege that implied conflict preemption applies here.  This kind of preemption arises when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," or it is "impossible for a . . . party to comply with both state and federal law."  Geier v. Amer. Honda Motor Co., Inc., 529 U.S. 861, 899 (2000).  Congress does not "cavalierly pre-empt state-law causes of action."  Medtronic, Inc. v. Lohr, 518 U.S. 470, 485

---

faulty product."  Nestlehutt v. Am. Indus. Chem. Corp., 2005 U.S. Dist. LEXIS 46153, at *15-6 (N.D. Ga. May 5, 2005) (citing O.C.G.A. §11-2-318; Bryant v. Hoffmann-La Roche, Inc., 262 Ga. App. 401, 411 (2003)).  In Bryant v. Hoffmann-La Roche, Inc., 262 Ga. App. 401 (2003), the Georgia Court of Appeals held that a patient was not entitled to assert a claim based on an implied warranty of the drug at issue because there was no privity between the manufacturer of the drug and the patient, because the patient did not purchase the drug directly from the manufacturer.  Id. at 411.

(1996). "Because matters of public health and safety traditionally fall within the domain of the states, it must be presumed that Congress did not intend to supersede the states' powers to regulate." Barnhill v. Teva Pharmaceuticals USA, Inc., 2007 U.S. Dist. LEXIS 44718, *6 (S.D. Ala. Apr. 24, 2007) (citing Hillsborough County v. Automated Med. Lab., 471 U.S. 707, 715 (1985)).

a.    Background

Defendants' preemption argument is best evaluated against the backdrop of the regulatory scheme for obtaining FDA approval of brand name and generic drugs.

The Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301, et seq., was enacted to protect public health. To this end, the FDCA requires premarket approval of new drugs. Manufacturers of new, brand name pharmaceuticals must submit a new drug application ("NDA") to the FDA, including the proposed labeling for the drug. See 21 U.S.C. § 355; 21 C.F.R. § 314.105(b). After the FDA approves the drug and its label, the manufacturer may, in limited circumstances, change the labeling if it provides the FDA with notice of the change. 21 C.F.R. § 314.70(c). This is known as the "change being effected" or "CBE" provision of the regulations. The CBE process may be invoked only to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or

to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product."  Id. at § 314.70 (c)(6)(iii)(A), (C).

The approval process for generic drugs is slightly different.  In 1984, Congress adopted the Drug Price Competition and Patent Term Restoration Act, also known as the Hatch-Waxman Amendments, which implemented an abbreviated new drug application ("ANDA") procedure for manufacturers who produce a generic of a brand name drug that has already completed the NDA process.  See 57 Fed. Reg. 17950 (Apr. 28, 1992).  Under the ANDA procedure, manufacturers must show that the generic drug is bioequivalent to the brand name drug and that the labeling will be the same.  See 21 U.S.C. § 355(j).

b.    Analysis

The Court must determine whether the CBE provision that permits manufacturers to add additional warnings to their labels without prior FDA approval is exclusively available to brand name manufacturers or if generic manufacturers may also use this process.  Both parties agree that ANDA drug labeling must be identical to brand name drug labeling at the time of FDA approval.  Plaintiff contends, however, that generic manufacturers may make post-approval labeling changes.  Defendants argue these changes are not allowed.

In support of her argument that the CBE process is available to ANDA-approved generic drugs, Plaintiff relies on the FDA's 1992 regulations implementing the Hatch-Waxman Amendments and ANDA requirements.  Entitled "supplements and other changes to an approved abbreviated application," 21 C.F.R. § 314.97 states that "[t]he applicant shall comply with the requirements of §§ 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application."  The "requirements of § 314.70," referenced in § 314.97, include the CBE provision.

Defendants claim that the FDA consistently has maintained that a generic drug label must match the label of its brand name counterpart, even post-approval.  Defendants cite to a number of statements by the FDA.  See Defs' MSJ, 17-20.[12] The only one of these FDA statements that specifically refers to the availability of the CBE process to generic drug manufacturers is a footnote in the preamble to the FDA's 2008 proposed revision to § 314.70(c), which states "CBE changes are not

---

[12] Defendants also note that 21 C.F.R. §314.150(b)(10) permits the FDA to withdraw approval of a generic drug application if it finds that "the labeling for the drug product that is the subject of the abbreviated drug application is no longer consistent with that for the [brand name] drug."  Defendants have not pointed to any instances where the FDA has invoked this procedure to withdraw a generic drug application because a manufacturer added or strengthened a warning.  See Stacel v. Teva Pharmaceuticals, USA, 620 F. Supp. 2d 899, at *14 (N.D. Ill. 2009); see also Bartlett v. Mutual Pharmaceutical Co., Inc., 2009 U.S. Dist. LEXIS 90528, at 60-4 (D. N.H. Sept. 30, 2009).

available for generic drugs approved under an abbreviated new drug application

under 21 U.S.C. § 355(j).  To the contrary, a generic drug manufacturer is required

to conform to the approved labeling for the listed drug."  Def.'s MSJ, 19 (quoting

73 Fed. Reg. 2848, 2849 n.1 (Jan. 16, 2008)).[13]

District courts are divided over whether generic drug manufacturers can

change generic drug labels.  Some courts have found label-related product liability

claims against generic drug manufacturers preempted where the state law claim

would require the generic label to be different from the brand name drug labeling.

Other courts have found preemption does not apply.  The United States Supreme

Court recently held in Wyeth v. Levine, 129 S. Ct. 1187 (2009), that, in the context

of brand name drugs, state law failure to warn claims regarding the adequacy of an

---

[13] The majority of the FDA statements cited by Defendants are not specific to post-approval labeling.  Both parties agree that brand name and generic drug labeling must be the same prior to FDA approval.  The only other statement to which Defendants cite is the FDA's rejection of a 1992 proposal that would have allowed generic manufacturers "to deviate from the labeling for the [brand name] drug to add contraindications, warnings, precautions, adverse reactions, and other safety-related information."  Defs' MSJ, 17.  Defendants highlight the FDA's comment that, "[a]fter approval of an ANDA, if an ANDA holder believes that new safety information should be added, it should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised."  Id. at 18 (quoting 57 Fed. Reg. 17950, cmt. 40 (Apr. 28, 1992)).  The Court does not interpret this language as contrary to Plaintiff's assertion that ANDA-approved generic drugs may revise their labeling after initial approval.  See Bartlett, 2009 U.S. Dist. LEXIS 90528 at *64-6.

existing label are not preempted by federal law.  Only a few district courts have

addressed whether the reasoning and holding in <u>Levine</u> applies to generic drugs.

<u>See</u> <u>Stacel v. Teva Pharmaceuticals, USA</u>, 620 F. Supp. 2d 899 (N.D. Ill. 2009);

<u>Kellogg v. Wyeth</u>, 612 F. Supp. 2d 437, 441 (D. Vt. 2009); <u>Bartlett v. Mutual</u>

<u>Pharmaceutical Co., Inc.</u>, 2009 U.S. Dist. LEXIS 90528 (D. N.H. Sept. 30, 2009).

Although <u>Levine</u> addressed the labeling of a brand name drug, the courts in <u>Stacel</u>,

<u>Kellogg</u>, and <u>Bartlett</u> found <u>Levine</u> instructive, and rejected implied preemption in

the generic drug context.[14]

These courts found that "the regulations affecting generic drug applications

[21 C.F.R. § 314.97] state explicitly that the CBE provisions apply to generic drug

manufacturers just as they do to name-brand manufacturers."  <u>Stacel</u>, 620 F. Supp.

2d at 905; <u>see</u> <u>also</u> <u>Kellogg</u>, 612 F. Supp. 2d at 441 ("The plain language of FDA's

regulations communicates the obligation borne by name brand and generic

manufacturers alike to revise a label to add or strengthen a warning in the light of

newly acquired information."); <u>Bartlett</u>, 2009 U.S. Dist. LEXIS at *53-4.  Given

this clear regulation, the courts afforded little deference to the FDA's footnote in

the preamble to the 2008 regulations.  These courts noted that the general

---

[14] The cases to which Defendants cite for the proposition that "numerous
federal courts have found failure-to-warn claims preempted under like
circumstances" were decided prior to <u>Levine</u>.  <u>See</u> Defs' MSJ, 24.

principles expressed in <u>Levine</u> do not support preemption in this area.  In <u>Levine</u>, the Supreme Court found that the history and administration of the FDCA did not suggest that Congress intended FDA approval of drug labeling to have broad preemptive effect.  <u>Levine</u>, 129 S. Ct. at 1194-96.  The Court noted that "[f]ailure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times.  Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation."  <u>Id.</u> at 1202.  The Court further found that "[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point the FDCA's 70-year history."  <u>Id.</u> at 1200.

This Court agrees with the reasoning of these post-<u>Levine</u> courts.  Given the FDA's regulation providing that the CBE process applies to ANDA-approved generic drug manufacturers and the Supreme Court's recent findings in <u>Levine</u>, Defendants' federal preemption argument is unpersuasive.

### III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants Mylan Pharmaceuticals, Inc.'s, Mylan Laboratories, Inc.'s, and Mylan Bertek Pharmaceuticals Inc.'s

Motion for Summary Judgment [57] is **GRANTED**.  As discussed within this Opinion and Order, Defendants' Motion for Summary Judgment is granted with respect to Plaintiff's failure to warn claims on the grounds that Plaintiff cannot establish causation under the learned intermediary doctrine.  Specifically, summary judgment is granted on Count I and those allegations in Counts II, III, IV, VI, VII, VIII, and IX that allege liability for failure to warn.  Summary judgment also is granted on Count V for the reasons set forth in this Opinion and Order.

**IT IS HEREBY FURTHER ORDERED** that the parties shall, on or before December 10, 2009, submit their proposed consolidated pretrial order as required by Local Rule 16.4.

**SO ORDERED** this 10th day of November, 2009.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE